IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

United States of America,                          Case No. 1:07 CR 89

                                    Plaintiff,     MEMORANDUM OPINION
                                                   AND ORDER

                 -vs-
                                                   JUDGE JACK ZOUHARY
Pedro Soto, et al.,

                                    Defendants.

## BACKGROUND

Defendant, Pedro Soto ("Pedro"), has been charged with possession with intent to distribute

100 kilograms or more of a mixture containing a detectable amount of marijuana, in violation of 21

U.S.C. §§ 841(a)(1) and 841 (b)(1)(B)(vii).  On July 25, 2007, the Court held an evidentiary hearing

on Pedro's Motion to Suppress, during which the Court received exhibits and heard testimony from

Government witnesses including Chad Flohr and Dan Obarski.  At the conclusion of the hearing the

Court informed the parties of its decision to deny the Motion but said that it would provide a more

detailed analysis in a written opinion.  The following constitute the Court's findings of fact and

conclusions of law upon which it denies the Motion.

## FINDINGS OF FACT

On March 26, 2007, at approximately 3:35 a.m., Pedro pulled his tractor trailer into the weigh

station located near mile marker 8 on northbound Interstate 69 in Branch County, Michigan.  Pedro

was accompanied by his nephew, Ove Soto.  Michigan State Police Motor Carrier Officer Chad Flohr

was working alone at the weigh station at that time.  While the tractor trailer was on the scales, Officer

Flohr noticed that a rear tail light on Pedro's Peterbuilt tractor was not working. Officer Flohr instructed Pedro to pull the truck off to the side, and obtained identification from Pedro and Ove. During an initial exchange, Pedro told Officer Flohr that he was traveling from Texas to Holland, Michigan. Officer Flohr informed Pedro that he was going to conduct an inspection of his vehicle.

Officer Flohr testified there are five levels of inspections and, while he has some discretion regarding which type of inspection to conduct, he usually conducts Level I inspections when he is working at a weigh station, and only after he observes a safety violation. A Level I inspection is the most comprehensive inspection, and he would conduct a more limited inspection on the side of a highway while on road patrol due to safety concerns.

During this inspection, Officer Flohr discovered a number of other violations in addition to the burned-out tail light, including an unsecured fire extinguisher in the cab, brakes out of adjustment, and failure to maintain logs for the previous seven days (Hearing Exhibit 4). Pursuant to the North American Standard Level I Inspection Procedure (Hearing Exhibit 5) and Michigan Department of State Police Policy (Hearing Exhibit 6), Officer Flohr opened the door of the trailer, which had been sealed, to check for cargo area securement.[1] He entered the trailer and noticed a box of product lying loose on the floor and also observed that the top layer of the first pallet was loose (Hearing Exhibit

---

[1]

Step 19 of the North American Standard Level I Inspection Procedure states, under the heading "Cargo Securement": "Where load is visible, check for proper blocking and bracing. It may be necessary to examine inside of trailer to assure that large objects are properly secured." The Michigan Department of State Police Policy also addresses inspection of the cargo areas of commercial trucks and states:

> Section 6(5) of the [Motor Carrier Act] permits a motor carrier officer to open the cargo portion of a vehicle, including breaking seals, in order to inspect its contents for safety and hazardous materials violations. This provision further allows for the inspection of any packages within this area. **Personnel will incorporate the inspection of the cargo area into their NAS Level inspections to determine if any violations of the hazardous materials regulations or other securement requirements exist.** (emphasis added)

13d).  He also noticed that further back in the load, other boxes were out of place and not properly stacked and wrapped.

Officer Flohr left the trailer and asked Pedro to go with him to the scale house.  Inside the scale house, Officer Flohr asked Pedro about the discrepancy between the place of delivery shown on the bill of lading -- Greenwood, Indiana -- and Pedro's earlier statement that he was traveling to Holland, Michigan, but Pedro failed to provide an answer.  Officer Flohr then asked Pedro for consent to search the trailer.  Pedro said he could not consent to the search without authorization from his dispatcher in Harlingen, Texas.  Pedro then spoke (presumably) with his supervisor for several minutes.  After he finished the phone call, Pedro signed a written consent card entitled "Consent Search Warning" (Hearing Exhibit 3) which had previously been read to him by Officer Flohr. Officer Flohr waited for backup officers to arrive before searching the trailer.  When Michigan State Police Officers Obarski and Price arrived at the weigh station, Officer Flohr climbed back in the trailer with a step ladder and discovered several packages later confirmed to be marijuana mixed in with the load of brocoli.

## CONCLUSIONS OF LAW

The Fourth Amendment preserves the right of citizens "to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures." U.S. Const. amend. IV.  "[A] search conducted without a warrant issued upon probable cause is *per se* unreasonable, . . . subject only to a few specifically established and well-delineated exceptions." *Schneckloth v. Bustamonte*, 412 U.S. 218, 219 (1973) (internal quotations omitted).  Valid consent is one of the exceptions. *Id.* at 219. *See also United States v. Carter*, 378 F.3d 584, 593 (6th Cir. 2004).

By way of background, Pedro initially argued that the evidence obtained during the search of the trailer must be suppressed because consent, the only possible exception to the warrant requirement, does not apply.  He argued that Officer Flohr did not have probable cause to search the trailer, and any consent that Officer Flohr obtained was invalid under the Sixth Circuit's decision in *United States v. Chambers*, 395 F.3d 563 (6th Cir. 2005), because Officer Flohr had already entered the trailer illegally, which invalidated the subsequent consent.  In response, the Government conceded that Officer Flohr initially entered the trailer without probable cause and without consent, but that neither probable cause nor consent was required because commercial trucking is a pervasively regulated business and the Michigan Motor Carrier Safety Act of 1963 (the "Act") provided the requisite authority to enter and inspect the trailer.

The issue then is whether Officer Flohr's entry into the trailer to check for proper securing of the load was permissible under the regulatory search doctrine set forth in *New York v. Burger*, 482 U.S. 698 (1987).  If so, the initial entry was valid and the subsequent, more thorough, inspection was valid under both the *Burger* doctrine and the consent exception to the warrant requirement.[2]

The pervasively regulated business doctrine recognizes that, in contrast to a private home, a person has a diminished expectation of privacy in a commercial premises, especially where the property is employed in a "closely regulated" industry.  *See Burger*, 482 U.S. at 699.  It provides that

---

[2]

At the hearing, the Government raised the issue of Pedro's standing to contest the search based upon defense counsel's repeated references to the seal on the trailer door.  As the Court understands it, the seal is intended to be broken only by the recipient of the cargo upon delivery.  The function of the seal is to provide an assurance that all persons, including the driver, have been excluded from accessing and tampering with the load once it has left the shipper.  In other words, an unbroken seal is proof of an unadultered shipment.  The Government's argument, therefore, is that if Pedro was effectively excluded from the trailer, he lacks a legitimate expectation of privacy in the trailer and its contents under the Fourth Amendment.  While the argument may have some merit, neither side briefed or presented sufficient evidence on the standing issue.

a warrantless search of a pervasively regulated business is permitted if: (1) there is a substantial government interest that informs the regulatory scheme pursuant to which the inspection was made; (2) the inspection is necessary to further the regulatory scheme; and (3) the statutory or regulatory scheme provides a constitutionally adequate substitute for a warrant. *See id.* at 702-03. To meet the final criterion, the regulatory scheme must (1) provide notice that the inspection is being made pursuant to law; and (2) limit the discretion of the inspecting officers. *See id.* at 703.

Pedro concedes, as he must, that the first two requirements of the doctrine are met. *See United States v. Dominquez-Prieto*, 923 F.2d 464, 468 (6th Cir. 1991) (concluding that commercial trucking is the type of heavily regulated industry to which the *Burger* analysis applies because the government has a substantial interest in regulating common carriers in the trucking industry and warrantless inspections are critical to the effective enforcement of the regulatory scheme); *United States v. Maldonado*, 356 F.3d 130, 135 (1st Cir. 2004) (stating that "the government has a significant interest in regulating the interstate trucking industry" and noting that it is "self-evident that warrantless inspections of commercial trucks are necessary to further the regulatory scheme"); *United States v. Fort*, 248 F.3d 475, 480 (5th Cir. 2001) (same). Pedro contends, however, that the Act fails to meet the third *Burger* criterion. Specifically, he contends that the Act does not provide a constitutionally-adequate substitute for a warrant because it confers "unfettered" discretion upon motor carrier officers to search commercial trucks at their pleasure.

The Government initially cited M.C.L.A. § 480.16(1) and (4) as providing support for Officer Flohr's inspection:

> (1) Motor carriers shall submit, upon demand, all their transportation safety related documents, such as all records and information pertaining to any accident, drivers' records of duty status, bills of lading, shipping records, driver time and payroll records, driver qualification records, vehicle maintenance records, and equipment for

5

inspection or copying during regular business hours to any enforcement member of the motor carrier division displaying a valid Michigan department of state police, motor carrier division identification card.

\* \* \*

(4) An enforcement member of the motor carrier division of the department of state police displaying valid identification may, without a warrant, require the cargo carrying portion of a vehicle to be opened for inspection of the cargo, any object within that portion of the vehicle, or the interior of the vehicle or any compartment within the interior of the vehicle. . . .

In a subsequent brief, the Government cited M.C.L.A. 480.17(2) as also authorizing the inspection:

(2) A peace officer or an enforcement member of the motor carrier division of the department of state police, upon probable cause to believe that a motor vehicle is being operated in violation of this act or a rule promulgated under this act, may stop the motor vehicle and inspect the motor vehicle. If a violation is found, the officer may issue a notice to appear for that violation.

The Court concludes, based upon the evidence presented at the hearing, that Section 7(2), M.C.L.A. § 480.17(2), authorizing an inspection upon probable cause to believe that a vehicle is being operated in violation of the Act, and Section 6(4), M.C.L.A. § 480.16(4), authorizing the warrantless inspection of the cargo carrying portion of a vehicle, are the sections pertinent to the Court's analysis. This conclusion is consistent with the testimony of Officer Flohr, as well as the Michigan State Police Policy (Hearing Exhibit 6) which incorporates Section 6(5) of the Act (now Section 6(4)) and provides for inspection of the cargo portion of a vehicle into the NAS Level inspections "to determine if any violations of the hazardous materials regulations or other securement requirements exist."

*Burger* involved the issue of whether warrantless searches pursuant to a New York statute regulating automobile scrapyards fell within the pervasively regulated business exception to the warrant requirement. The statute provided, in part:

Upon request of an agent of the commissioner [of the Department of Motor Vehicles] or of any police officer and during his regular and usual business hours, a vehicle dismantler shall produce such records and permit said agent or police officer to

> examine them and any vehicles or parts which are subject to the record keeping requirements of this section and which are on the premises . . . .

*Burger*, 482 U.S. at 694 n.1. Regarding the third requirement for valid regulatory schemes, the Court held that the New York statute provided a "constitutionally adequate substitute for a warrant." *Id.* at 711 (quoting *Donovan v. Dewey*, 452 U.S. 594, 603 (1981). First, the Court observed that the statute informed operators that they would be subject to regular inspections, thus making inspections a function of the regulatory scheme rather than at the discretion of the government official. *See id.* Second, the Court noted that the statute defined the scope of the search and who was authorized to conduct the inspection. *See id.* Finally, the Court noted that the statute limited the "time, place, and scope" of the inspection by: (1) allowing inspections only "during [the operator's] regular and usual business hours"; (2) permitting inspections only of vehicle dismantling and related industries; and (3) limiting the scope of inspections to records and vehicles or parts subject to record keeping requirements of the statute and which are located on the premises. *Id.* at 711-12.

In *Dominquez-Prieto*, *supra*, the Sixth Circuit upheld a roadside inspection of a commercial truck pursuant to a Tennessee statute that permitted warrantless stops and inspections based upon a "reasonable belief" that a safety violation was occurring. In that case, a Tennessee public service commission officer pulled the defendant's tractor-trailer into an inspection station to conduct a routine safety inspection. The officer noticed the defendant was visibly nervous and shaking, and when the officer asked the defendant for his bill of lading, the defendant responded he did not have one. The defendant said he was driving from Texas to New York City without a load. When the officer examined the defendant's log book, he noticed it had not been kept up to date. Finally, the officer noticed the trailer, which was supposedly empty, was padlocked. At the conclusion of the inspection,

7

the officer asked the defendant if he could look inside the trailer, but the defendant said he did not have the key.  The officer subsequently had the lock removed and discovered cocaine.

The Sixth Circuit rejected the defendant's argument that the search violated the Fourth Amendment, finding it valid under *Burger*.  After concluding that the first two requirements of the *Burger* test were satisfied, the court then examined the third requirement by comparing the statute at issue with the statute in *Burger*.  First, it found that, as in *Burger*, the statute limited the authority to inspect to particular persons -- public service commission officers.  *See* 923 F.2d at 469.  Second, it found the Tennessee statute to be even more restrictive because it authorized an inspection "upon reasonable belief" that a violation was occurring, whereas the statute in *Burger* required no level of suspicion.  *See id.*  Third, the court noted that, as in *Burger*, the statute restricted officers' discretion regarding what could be inspected (motor vehicles subject to and operating in violation of the statute). *See id.*  Finally, the court observed that the statute in *Burger*, although narrower in the sense that it limited the time during which an inspection could be conducted (regular business hours), was an "inconsequential" difference because:

> Such a limitation would, of course, render the entire inspection scheme unworkable and meaningless.  Trucks operate twenty-four hours a day and the officers must, necessarily, have the authority to conduct these administrative inspections at any time.

*Id.* at 470.  The court went on to conclude that the officer had a well-founded suspicion, sufficient to constitute a reasonable belief, that the defendant might be transporting illegal cargo.

Considering the applicable provisions of the Act in light of *Burger* and *Dominguez-Prieto*, this Court concludes that the Act provides a constitutionally adequate substitute for the warrant requirement.  First, the statute prescribes who may search and what may be searched: only a peace officer or an enforcement member of the motor carrier division of the state police (such as Officer

Flohr) may search, and the search is limited to a commercial vehicle (such as Pedro's tractor and trailer). Second, the statute here is more restrictive than the statutes in *Burger* and *Dominguez-Prieto* because the statute in *Burger* required no level of suspicion and the statute in *Dominguez-Prieto* required only a reasonable suspicion, whereas here we have an actual finding of a safety violation (inoperable tail light). Finally, while the statute does not limit the time when an inspection may be conducted, such as during regular business hours limitation in *Burger*, such a limitation would be unreasonable and unworkable in the world of commercial trucking which, as recognized in *Dominguez-Prieto*, operates twenty-four hours a day throughout the nation.

In short, the applicable provisions of the Act do not confer complete discretion upon motor carrier officers to determine when to inspect. A motor carrier officer may conduct an inspection only upon probable cause to believe that a vehicle is being operated in violation of the Act, including applicable federal regulations. Any such inspection includes a securement check of the cargo area. Absent probable cause, an inspection cannot occur. Officer Flohr's testimony was consistent with the statute. He stated that if no violation is observed at the weigh station, a truck is allowed to "roll[] through and go[] back out on the road," while an inspection is performed only if a violation is observed. Finally, although it does not appear to be in dispute, the Court concludes that the burned out tail light met the probable cause requirement under the Act.

Pedro argues that regardless of the statutory limitations, motor carrier officers still have unlimited discretion because Officer Flohr testified that he could choose to perform any level of inspection. However, Officer Flohr testified that he only performs Level I inspections at weigh stations and performs Level II or III inspections (which are less thorough) when he is patrolling on the road due to safety concerns. Nothing in Officer Flohr's testimony suggests that a driver stopped

at a scale would expect anything other than a Level I inspection.  Moreover, Michigan State Police Policy instructs officers to incorporate the inspection of cargo areas pursuant to Section 6(4) of the Act into all NAS inspections without limitation as to any particular level, which means that a driver should expect an inspection of the cargo area regardless of the level of inspection.  And, even if motor carrier officers do have some discretion to determine the type of inspection, this would not run afoul of *Burger*.  *Burger* requires only that an officer's discretion be sufficiently cabined, not completely eliminated.[3]

Pedro relies upon *State of Tennessee v. McClure*, 74 S.W.3d 362 (Tenn. Ct. App. 2001), in which the Court of Criminal Appeals of Tennessee held that Tennessee's regulatory scheme for periodic inspections did not satisfy *Burger*'s third requirement.  The Tennessee statutory scheme adopted the Federal Motor Carrier Safety Regulations for safety inspections.[4]  Although the court found that the regulations limited officers' discretion in many respects, it concluded that they were nonetheless deficient because they "allow[ed] safety inspections to be conducted totally at the discretion of the officer in the field."  *Id.*  The court's concern was that nothing guided an officer's decision when to search, resulting in totally random searches:

> In the case before us, Officer Rollins and Officer Feathers both testified that the officers in the field have complete discretion to decide which vehicles to inspect.  They are not given any guidance by the rules or by superior officers.  Officer Feathers testified that an officer may make the decision to perform a safety inspection if the

---

[3]

Pedro argued at the hearing that the "Cargo Securement" portion of Step 19 of the North American Standard Level I Inspection Procedure is limited to trailers on which the load is visible and does not permit inspections where the load is completely enclosed within a trailer.  As stated at the hearing, the Court disagrees with such an interpretation, but, in any event, the argument is moot because Section 6(4) of the Act and the Motor Carrier Policy (Hearing Exhibit 6) provide authority to "open the cargo portion of a vehicle, including breaking seals, in order to inspect its contents for safety and hazardous materials violations."

[4]

*McClure* did not involve the same Tennessee statute addressed in *Dominguez-Prieto*.

10

officer "feels like" the vehicle need inspecting for "whatever reason." Officer Rollins testified that their decisions may be based on such considerations as the number of enforcement officers working and the volume of trucks coming through the scales, but often they are based not on a desire to ensure compliance with safety regulations but are instead based on a desire to search for possession of illegal drugs. Essentially, the decision of whom to seize and when to seize is an arbitrary decision left to the "unfettered discretion of officers in the field." Certainly, the decision to seize is not made "pursuant to a plan embodying explicit, neutral limitations on the conduct of individual officers." Because the decision to perform a safety inspection is so arbitrary and unpredictable, we do not believe that a commercial motor carrier owner or operator could have any real expectation that his or her vehicle would be subject to periodic inspection.

*Id.* at 376 (citations omitted).

*McClure* is distinguishable from this case for several reasons. First, the statute in this case limits an inspection only to those instances in which the motor carrier officer has probable cause to believe that a violation exists, whereas there was no such limitation in *McClure*. Second, in contrast to the officers' testimony in *McClure*, Officer Flohr did not state that officers can search whenever they "feel like it" for "whatever reason." Third, Officer Flohr was guided by rules and a specific and published inspection checklist. Thus, *McClure* does not affect the Court's analysis.

### CONCLUSION

In sum, Officer Flohr's initial entry into the trailer was permissible under *Burger*, and his subsequent, more extensive, inspection of the trailer was permissible under *Burger* and also because Pedro had given valid consent.

For the foregoing reasons, the Court denies the Motion to Suppress (Doc. No. 39).

IT IS SO ORDERED.

      *s/ Jack Zouhary*
      JACK ZOUHARY
      U. S. DISTRICT JUDGE

      July 31, 2007